**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 23-cr-182 (ABJ)** |
| **JOANNA SMITH,** | |
| **Defendant.** | |

**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

Approximately one year ago, Ms. Smith left her home in Brooklyn, New York and traveled to Washington, D.C. to commit a crime. She planned this crime for months. Ms. Smith planned with others to enter a public museum and throw paint on a priceless and singular art exhibit. She did so with no concern for the repercussions. As a result of her actions, the art exhibit had to be removed from public display for ten days, robbing many, including those traveling from abroad, the opportunity to appreciate this work. Her actions deeply impacted the employees of that museum who, to this day, are concerned about repeat attacks. Ms. Smith has expressed no remorse for her actions. Ms. Smith did not commit this crime out of greed or need. Instead, Ms. Smith committed this crime because she believed her political views outweighed anything and anyone else. For the following reasons, the Government requests that the Court sentence Ms. Smith to thirty days' incarceration, followed by three years supervised release.

**BACKGROUND**

***The Offense Conduct***[1]

On April 27, 2023, Ms. Joanna Smith traveled to the National Gallery of Art (the NGA)

---

[1] While most of the facts referenced in this submission were admitted to by Ms. Smith at her plea hearing, additional facts such as the estimated value of the sculpture, the potential harm to the sculpture, and the ongoing and lasting harm to NGA staff will be proven at the sentencing hearing with live testimony from a representative or representatives from NGA. Much of this is

in Washington, D.C. with a co-conspirator.  She went with the purpose and intent of smearing paint on the protective case and supporting pedestal of the NGA exhibition containing Edward Degas' wax sculpture entitled *Little Dancer Aged Fourteen*, which was completed in 1881 (the "Exhibit").  Ms. Smith conducted research into the Exhibit and specifically targeted this Exhibit.

Before entering the NGA, Ms. Smith and her co-conspirator recorded video statements of themselves explaining their purpose in committing the offense.  At 10:43 AM, Ms. Smith entered NGA.  As she did, she and her co-conspirator concealed water-soluble paint in recycled aluminum water bottles to enable them to pass through security undetected.  Ms. Smith walked around the NGA prior to the offense, at one point providing her cellphone to another individual who had accompanied them to the NGA.  Smith approached the Exhibit and waited until members of the public cleared the area around it.  Smith then removed the water bottle containing red paint and began finger painting on the pedestal the sculpture sits on, and then smeared paint on the protective vitrine case surrounding the sculpture.  Paint also spilled onto the gallery floor.  As Ms. Smith smeared paint on the Exhibit, she made statements explaining why she had engaged in the offense.  After Ms. Smith was detained and released, she made additional statements explaining her purpose in committing the offense.

Experts at the NGA determined that to repair the Exhibit it had to be removed from public display.  As a result, the Exhibit could not be displayed for ten days.  During this time members of the public, including groups who had traveled great distances and specifically intended to view the Exhibit, could not.  The NGA estimated that the cost to repair the Exhibit totaled $4,062.  This included the costs for a private contractor to remove and clean the protective vitrine (10 hours of labor costing $680), costs for a private contractor to repaint and re-wrap the

---

also contained in an interview with conservators from NGA which is attached to this submission as Government's Sentencing Exhibit A.

base of the Exhibit, and refinish the gallery floor (20 hours of labor costing $1,550), costs for new materials used in the repairs ($200), and costs for a private contractor to safely reinstall the Exhibit (24 hours of labor costing $1,632).   This does not include the costs associated with any the NGA staff in responding to Smith and Martin's actions, including the addition of new security protocols and the necessity for the NGA conservators to consult on how best to uninstall, move, and repair the Exhibit.   The cost for two conservators to consult on the deinstallation and movement of the Exhibit for repairs was estimated to be $414 (three hours of work for two conservators at $69 per hour) and the cost for two conservators to assess the Exhibit in the laboratory was $828 (six hours of work for two conservators at $69 per hour).

*Little Dancer Aged Fourteen* is an incredibly fragile and complex piece of art.  It was composed of wood, clay, rope, paintbrushes, padding material and wire, assembled over a lead armature, and covered by a thin skin of beeswax.

*Figure 1*



*Little Dancer* was the only of Degas' sculptures exhibited during his lifetime.  Given her fragility, *Little Dancer* has a history of visible cracks in her knees, left ankle, and around her ballet slippers.  In addition to cracks visible to the naked eye, additional damage can be seen in scans of the sculpture.  As a result, the expert conservators at NGA rarely move the sculpture or the case protecting it.  Any movement of the sculpture and any impact to the protective case can damage the sculpture.

Here, Ms. Smith's actions caused a split in the protective case around the sculpture. NGA conservators believe that the striking of the case and the resulting vibrations may have damaged the sculpture.  This damage would have been exacerbated when Ms. Smith's actions required NGA to remove the case and move the sculpture to assess it and repair the damage to the Exhibit.  After this offense, NGA conducted scans of the sculpture.

*Figure 2*



The scans reflected that the cracks in the sculpture, particularly in the ankles and knees, had gotten worse since 2015 when the sculpture was last scanned.  These conservators cannot say with certainty whether those worsened cracks were a result of the passage of time or Ms. Smith's actions.

It is difficult to precisely estimate the value of a unique masterpiece like *Little Dancer*. There is not an active market for works of art of this kind.  Experts at NGA estimate that the sculpture has a value of approximately $120 million.

### *The Pre-Sentence Investigation Report*

The Pre-Sentence Investigation Report (PSIR) in this matter summarizes Ms. Smith's history.  Ms. Smith is fifty-four and was born in Berkley, California.  PSIR at § 51.  She described her childhood as "interesting" and "dynamic."  PSIR at § 54.  She is married with two children. PSIR at § 55.  Ms. Smith suffers from a collagen disorder and has had multiple surgeries as a result. PSIR at § 66.  Ms. Smith graduated high school in Berkeley, California.  PSIR at § 74.  She earned her bachelor's degree from Vassar College and received her master's degree from the University of Vermont.  *Id.*  She has volunteered with a number of organizations over several years.  PSIR at § 78.  She has been employed as a paralegal, executive assistant, producer, and program administrator.  PSIR at §§ 79-82.  Ms. Smith and her husband own multiple properties, from which they receive rental income.  PSIR at §§ 87-88.  Ms. Smith has never previously been arrested or convicted.  PSIR at §§ 43-49.  Ms. Smith was described in multiple interviews as a caring mother and loving wife.  PSIR at §§ 55-62.

## ARGUMENT

Although the Sentencing Guidelines are advisory, under *United States v. Booker*, a sentencing court "must consult those Guidelines and take them into account when sentencing."

543 U.S. 220, 264 (2005); *United States v. Brown*, 892 F.3d 385, 399 (D.C. Cir. 2018).   The

Supreme Court has noted that while the Guidelines provide "the starting point and the initial

benchmark" for sentencing, the district court should consider all the § 3553(a) factors.   *Gall v.*

*United States*, 552 U.S. 38, 49–50 (2007).   The Guidelines' recommended sentencing range will

ordinarily "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives."

*Kimbrough v. United States*, 552 U.S. 85, 108–09 (2007).

The listed factors in 18 U.S.C. § 3553(a) include the following:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed –
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>> (B) to afford adequate deterrence to criminal conduct;
>> (C) to protect the public from further crimes of the defendant; and
>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established for –
>> (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines –
>>> (i) issued by the Sentencing Commission . . .; and
>>> (ii) that, . . . are in effect on the date the defendant is sentenced; . . .
>
> (5) any pertinent policy statement –
>> (A) issued by the Sentencing Commission . . . and
>> (B) that, . . . is in effect on the date the defendant is sentenced.
>
> (6) the need to avoid unwarranted sentence disparities among

defendants with similar records who have been found guilty of
similar conduct; and

(7) the need to provide restitution to any victims of the offense.

But the Sentencing Guidelines are only "the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). They "are not the only consideration." *Id.* A sentencing judge "should . . . consider all of the § 3553(a) factors," and "[i]n so doing, . . . may not presume that the Guidelines range is reasonable." *Id.* at 50. "[I]t is not error for a district court to enter sentencing variances based on factors already taken into account by the Advisory Guidelines, in cases in which the Guidelines do not fully account for those factors, or when a district court applies broader § 3553(a) considerations in granting the variance." *United States v. Ransom*, 756 F.3d 770, 775 (D.C. Cir. 2014) (citation and internal quotation marks omitted). In doing so, "the district court can rely on hearsay as evidence for its findings." *United States v. Miller*, 35 F.4th 807, 818 (D.C. Cir. 2022). *See also United States v. Jones*, 744 F.3d 1362, 1368 (D.C. Cir. 2014) ("Clear precedent permits hearsay to be used in sentencing decisions."). And the sentencing court can consider conduct by a defendant that was not charged or even for which a defendant was acquitted. *See United States v. Settles*, 530 F.3d 920, 923 (D.C. Cir. 2008) ("[L]ong-standing precedents of the Supreme Court and this Court establish that a sentencing judge may consider uncharged or even acquitted conduct in calculating an appropriate sentence, so long as that conduct has been proven by a preponderance of the evidence and the sentence does not exceed the statutory maximum for the crime of conviction.").

## THE APPLICABLE SENTENCING GUIDELINES

U.S.S.G § 2B1.1 applies to the offense as it involved "Property Damage or Destruction." U.S.S.G § 2B1.1(c)(4) provides that: "if the offense involved a cultural heritage resource or a paleontological resource, apply §2B1.5 (Theft of, Damage to, or Destruction of, Cultural Heritage

Resources or Paleontological Resources; Unlawful Sale, Purchase, Exchange, Transportation, or Receipt of Cultural Heritage Resources or Paleontological Resources).”

A “cultural heritage resource” is defined, *inter alia*, as “an object of cultural heritage, as defined in 18 U.S.C. § 668(a)(2).”  Section 668(a)(2) in turn defines “object of cultural heritage” as “an object that is . . . over 100 years old and worth in excess of $5,000 . . . or . . . worth at least $100,000.”  The *Little Dancer* sculpture—which is 141 years’ old and has an estimated value of $120 million—qualifies under either.  Therefore, the question for the Court is whether this offense “involved” a cultural heritage resource.

The phrase “involved” is not defined in the Guidelines.  “In interpreting the Sentencing Guidelines, the Court applies the ordinary tools of statutory interpretation and looks to the plain meaning of its terms.” *United States v. Seefried*, 639 F. Supp. 3d 8, 10 (D.D.C. 2022).  *See also United States v. Williams*, No. CR 21-618 (ABJ), 2024 WL 1239989, at *2 (D.D.C. Mar. 22, 2024) (looking “to the plain meaning of the term at the time the provision was enacted” in interpreting the meaning of a Sentencing Guidelines provision).  “To discern the text’s plain meaning, courts look to dictionary definitions and analyze the word or phrase in context.” *Seefried*, 639 F. Supp at 10.

Merriam Webster defines “involved” as “having a part in something; included in something.”  Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/involved (last visited April 17, 2024).  The Oxford English Dictionary defines involved as “contained by implication, implicit.” *Involved*, Oxford English Dictionary, https://www.oed.com/dictionary/involved_adj?tab=meaning_and_use#17982 (last visited April 17, 2024).[2]  Based on its plain meaning, this offense “involved” the *Little Dancer* sculpture.

---

[2] Black’s Law Dictionary does not appear to define the word “involved.”

*Figure 3*



Ms. Smith admitted to specifically targeting the exhibit containing *Little Dancer*. She researched it and sought it out to further her political agenda. This was not just any case and base. The case contained this sculpture and was chosen for that purpose. Ms. Smith sat down in front of the sculpture, which she then used as a pulpit to deliver a political speech. After her release, Ms. Smith made statements specifically referencing the sculpture. Her statements were not about the case and base, they were about the sculpture. Ms. Smith admitted that she "poured paint over a priceless piece of art," and even identified the materials in the sculpture. She did not describe the composition of the case and base; she described the *Little Dancer*. In sum, this offense "involved"

11

the *Little Dancer* because it was the essential ingredient that animated Ms. Smith's conduct.   Put

simply, Ms. Smith would not have smeared paint on just any empty case.

This interpretation is consistent with the broad purpose animating the addition of the

Cultural Heritage Resource Guideline.  U.S.S.G. § 2B1.5 was added to the Guidelines in 2002.  As

the Commission stated:

> This amendment reflects the Commission's conclusion that the existing sentencing guidelines for economic and property destruction crimes are inadequate to punish in an appropriate and proportional way the variety of federal crimes involving the theft of, damage to, destruction of, or illicit trafficking in, cultural heritage resources. The Commission has determined that a separate guideline, which specifically recognizes both the federal government's long-standing obligation and role in preserving such resources, and the harm caused to both the nation and its inhabitants when its history is degraded through the destruction of cultural heritage resources, is needed.

638.Amendment, FCJ Federal Sentencing Guidelines Manual Amendment 638 (11/1/13).  The

Commission further explained: "[t]he higher base offense level represents the Commission's

determination that offenses involving cultural heritage resources are more serious because they

involve essentially irreplaceable resources and cause intangible harm to society."  *Id.*

Ms. Smith argues that the cultural heritage resource guideline does not apply because she

neither intended to nor actually harmed the sculpture itself.  As a factual matter, Ms. Smith's

stubborn insistence that she posed no threat to the sculpture is contrary to what experts from NGA

have said and contrary to what those experts will tell this Court in person.  But more importantly,

Ms. Smith's arguments sidestep the question before the Court.  The cultural heritage resource

guideline does not solely apply to offenses where a cultural heritage resource was harmed or

threatened.  The Guideline applies to any offense "involving" a cultural heritage resource.  If the

U.S. Sentencing Commission had intended this guideline to solely apply to offenses where a

cultural heritage resource was harmed or damaged, it easily could have said so.  The Commission

could have crafted this provision to say:  "if the offense *harmed*," "if the offense *damaged*," or even "if the offense *threatened to harm or damage*," a cultural heritage resource.  It did not. Instead, it crafted a broader provision consistent with a desire to protect incredibly important cultural objects that included all offenses *involving* such objects.

The Government's interpretation also is consistent with the few cases construing this Guideline.  In *United States v. Allen*, the Sixth Circuit interpreted this Guideline as applied to the theft of rare books.  516 F.3d 364, 365 (6th Cir. 2008).  There, the defendants had conspired to steal rare books from a library.  *Id.*  The defendants attempted to take seven rare books from the library but were forced to leave two behind given the weight of the books.  *Id.* at 368.  All seven books were recovered unharmed and undamaged.  *Id.*  One defendant argued with respect to sentencing that there was no actual loss as all the objects were recovered undamaged.  *Id.* at 371. Despite the fact that books were recovered unharmed and undamaged, the district court and Sixth Circuit both applied U.S.S.G. § 2B1.5.  *Id.* at 376-379.  Not only that, the Sixth Circuit found that the district court had erred by limiting its calculation of the offense level to the five books removed from the library and not to all seven that the defendants *attempted* to remove from the library.  *Id.* Ms. Smith's position that this guideline only applies where a cultural heritage resource is harmed or damaged is completely at odds with this decision.

Moreover, Ms. Smith's assertion that her offense level should be limited to NGA's restoration and cleanup costs misapplies this Guideline.  If the offense "involved" a cultural heritage resource, the offense level is driven by the value of the cultural heritage resource, not solely by the cost of restoration and repair.  The Application Notes to U.S.S.G. § 2B1.5 indicate that value of the resource "shall include":  (i) The archaeological value . . . (ii) The commercial value. . . ; (iii) The cost of restoration and repair."  U.S.S.G § 2B1.5, Application Note 2.  In other

words, given the importance of these resources, the Guideline specifically calls for a broader valuation than one solely based on restoration and repair.

In *United States v. Haggerty*, the Fifth Circuit rejected the same argument advanced by Ms. Smith, specifically that the restoration value should control.  No. 20-50203, 2021 WL 1827316 (5th Cir. May 7, 2021), *cert. denied,* 142 S. Ct. 759, 211 L. Ed. 2d 475 (2022).  There, a defendant had poured red paint on a statute of an American Indian.  *Id.* at *1.  In sentencing the defendant using § 2B1.5, the court had relied upon the total value of the statute based on its purchase price ($92,000) rather than the repair cost ($1,800).  *Id.* at *2.  The defendant there argued, as Ms. Smith does here, that where a resource "is restored to its prior physical condition, it is error to use the total value of that resource in calculating the offense level under USSG § 2B1.5; rather, the court should use the cost of restoration incurred in bringing the resource back to its prior condition." *Id.* at *9 (internal quotations omitted).  The Fifth Circuit found that this "argument plainly fails." *Id.* The Fifth Circuit found that there was no support in the text of the guideline suggesting that the restoration value should control: "There is nothing that suggests that 'the cost of restoration or repair" takes precedence over and obviates the other two valuations." *Id.* at 304.  Further, the Fifth Circuit found that the Sentencing Commission's explanation for the new Guideline further undercut the defendant's arguments: "[T]he Commission makes it clear that the harm that it is concerned about when it comes to the damage and destruction of cultural heritage resources is not purely (or even primarily) the resource's physical condition or monetary value. Rather, the purpose of § 2B1.5 is to provide 'flexibility' to appropriately *punish* offenders for both the tangible and *intangible* harm caused by their damage of cultural heritage resources." *Id.*  The Fifth Circuit noted that the Commission had expressly elected not to use the concept of "loss," which was generally relied upon in property destruction cases:  "The Commission has elected not to use the

concept of 'loss,' which is an integral part of the theft, fraud, and property destruction guideline at § 2B1.1, because cultural heritage offenses do not involve the same fungible and compensatory values embodied in 'loss.'" *Id.* at *10.  In conclusion, the Fifth Circuit found that the defendant's "argument would have us rewrite the text of § 2B1.5 in tension with the purpose behind its promulgation." *Id.*  The Fifth Circuit rejected that invitation and this Court should as well.

In essence, Ms. Smith asks this Court to sentence her as if she entered the lobby of a federal building and caused $4,062 in damage to the waiting room.  Ms. Smith did not do that.  Ms. Smith specifically targeted a priceless work of art, recklessly attacked the case and base protecting it, and then made statements explaining why she targeted that piece of art.  As such, this offense "involved" a cultural heritage resource, and U.S.S.G. § 2B1.5 applies.

Because U.S.S.G § 2B1.5 applies, the Government calculates the Sentencing Guidelines as follows:

| | | |
|---|---|---|
| U.S.S.G. § 2B1.5(a) | Base Offense Level | **8** |
| U.S.S.G. § 2B1.5(b)(1)(M) | Value between $65 and $150 million | **+24** |
| U.S.S.G. § 2B1.5(b)(2)(F) | In a museum | **+2** |
| | Total | **34** |

Because Ms. Smith accepted responsibility at the earliest opportunity, she is entitled to a 2-level reduction pursuant to U.S.S.G. § 3E1.1, and a further 1-level reduction pursuant to U.S.S.G. § 3E1.1(b).  Additionally, Ms. Smith meets the criteria under U.S.S.G § 4C1.1 and qualifies as a Zero-Point Offender, and her offense level should be reduced an additional 2 levels.

Therefore, Ms. Smith's total offense level is 29.  Ms. Smith has no criminal history.  Therefore, with a total offense level of 29, and a criminal history category of I, Ms. Smith's Guideline's Range is 87 to 108 months' imprisonment.  Because the maximum sentence for this offense is 60 months' imprisonment, however, the Guideline's range is 60 months' imprisonment.

The Guideline range for supervised release is one to three years, U.S.S.G. § 5D1.2(a)(2), and the Guideline range fine is $30,000 to $300,000.  U.S.S.G § 5E1.2.

### THE GOVERNMENT'S SENTENCING RECOMMENDATION

The Government recommends that the Court sentence Ms. Smith to thirty days of imprisonment followed by three years of supervised release, with the condition that she continue to stay out Washington, D.C. and not visit any museum.  The Government also requests that the Court order restitution in the amount of $4,062.  This sentence provides a significant penalty to Ms. Smith, time for her to reflect on the gravity of her actions, and, in this case most importantly, serves as a significant deterrent to others who would follow her example.

**A.  Nature and Circumstances of the Offense.**

On a Saturday morning, approximately one year ago, Ms. Smith entered NGA and smeared paint on a priceless work of art.  Ms. Smith was not driven by need or greed.  She was not driven by any mental or emotional malady.  She had planned on this act for months.  Ms. Smith's motivations were political.  And she believed her political beliefs outweighed anything and anyone else.  Ms. Smith was not the only visitor to NGA that day.  There were tourists, school groups, and members of our community, spending the morning appreciating works of significant cultural and artistic value.  There were also dedicated employees at NGA; individuals who spent their days curating and protecting these works.  Ms. Smith did not care.  Regardless of how it would impact these many other individuals, Ms. Smith believed that her strongly held opinions outweighed it all.

Before engaging in this attack, Ms. Smith handed her phone to a confederate, presumably to limit the ability of the Government to identify everyone involved.  Then, she approached the case of a priceless work of art:  Degas' *Little Dancer Aged Fourteen*.  She had spent some time online researching this work of art.  She thought she knew how fragile it was.  She thought she

knew it was constructed of natural materials such as beeswax.  She definitely knew it was one of a kind.  But there were certain things that Ms. Smith could not know.  Ms. Smith had no idea how light or heavy the case surrounding the sculpture was.  She had no idea how touching or moving the case might impact the statute.  She had no idea whether the case could easily topple over, destroying the sculpture inside.  None of this dissuaded her.  She approached this priceless work and recklessly began smearing paint all around the case and base.  People told Ms. Smith to stop. She ignored them.  Ms. Smith believed that her political message was more important than anyone and anything.

Ms. Smith's attack caused harm.  It cost approximately $4,062 to repair the case and the base of the Exhibit.  Her actions closed this Exhibit for ten days.  During that time, the hundreds of individuals who wanted to view this Exhibit could not.  Ms. Smith selfishly robbed them of that. And since this offense, it has been difficult for NGA and its employees to return to normalcy.  This offense was unprecedented for them.  No one has attacked an exhibit like that in NGA before. Moreover, NGA is a museum but also a workplace.  And NGA employees no longer feel safe in their workplace.  New security measures have been implemented because of Ms. Smith's actions. Employees are now on high alert for future attacks.  Ms. Smith has robbed these individuals of the mundane expectation of feeling secure at their workplace.

Ms. Smith has repeatedly argued or implied that she did not harm the sculpture and could not have harmed the sculpture.  But Ms. Smith is not a conservator.  She has no expertise in museum conservation.  She has no expertise with this sculpture.  And the actual experts from NGA have indicated that her actions—and the repairs made necessary as a result of her actions—may have damaged the sculpture.  The cracks that already existed as of 2015 had gotten worse when the sculpture was re-scanned following Ms. Smith's attack.  But putting aside whether the

sculpture was damaged, Ms. Smith's actions were incredibly reckless. She had no idea the damage she could have done to the sculpture and is stubbornly unwilling to accept the damage that she may have done to the sculpture. Her stubborn insistence otherwise is simply hubris and reflects that she has not accepted responsibility for her actions.

The nature and circumstances of this offense merit significant punishment.

**B. The History and Characteristics of the Defendant.**

Ms. Smith has no criminal history. She is well educated and has lived a productive and impressive life. She has raised two children and has a loving husband. While she has certainly experienced trauma and loss, there is no assertion that those difficulties have anything to do with this offense. This offense was about Ms. Smith valuing her political views above anything and anyone else.

Ms. Smith is of significant means. She could have used those means to express her political opinions in any number of ways. Ms. Smith could have distributed flyers, knocked on doors, built and hosted websites, donated to candidates of her choice, or even started a podcast. Ms. Smith chose a different path. Instead, Ms. Smith went to a public museum and robbed from hundreds of people the opportunity for them to view a singular work of art.

Ms. Smith's age, means, educational accomplishments, and background should not be considered a mitigating factor. Too many in our community commit crimes in relation to social or educational shortcomings. Ms. Smith is not of those individuals. Ms. Smith is not even a member of our community. She chose to leave her community and come to our community to engage in a senseless and destructive act. Her act caused damage to a museum exhibit, robbed many others of the opportunity to enjoy a unique piece of culture, and has caused lasting harm to NGA and its employees.

Ms. Smith's history and characteristics do not mitigate her conduct.

## C. The Need for the Sentence Imposed.

The requested sentence is sufficient but no greater than necessary to meet the goals of sentencing. The requested sentence provides specific deterrence: a lengthy period of probation coupled with a bar from museums and D.C. will ensure that Ms. Smith does not engage in this conduct for a significant period of time. More importantly, this sentence provides general deterrence. As this Court knows, Ms. Smith's actions were the first in a chain of attacks on D.C. museums. Ms. Smith is the first defendant in these offenses to be sentenced. Her sentence must indicate the seriousness of this conduct and deter future attacks. A sentence of incarceration, rather than just a fine, provides that general deterrence. Based on her means, and the means of the organization supporting her, a fine alone is an insufficient deterrent to this conduct. Finally, a sentence of incarceration—albeit brief—will signal to Ms. Smith the need to reflect on her conduct. As reflected in the PSIR, Ms. Smith is not remorseful for her conduct. She regrets that she was charged with a felony, but nowhere does she express any remorse for the harm she has caused to NGA, its employees, or its visitors.

## <u>CONCLUSION</u>

For all of the foregoing reasons, the Government respectfully requests that this Court sentence Ms. Smith to a term of imprisonment of thirty days followed by three years of supervised release.

Respectfully submitted,
MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052


Dated: April 17, 2024          By:    */s/ Cameron A. Tepfer*
                                      Cameron A. Tepfer

D.C. Bar No. 1660476
Assistant United States Attorney
United States Attorney's Office
for the District of Columbia
601 D Street NW
Washington, D.C. 20530
(202) 258-3515
Cameron.Tepfer@usdoj.gov